IN THE SUPREME COURT OF NORTH CAROLINA

No. 272A23

Filed 12 December 2025

NORTH CAROLINA DEPARTMENT OF REVENUE

v.

WIRELESS CENTER OF NC, INC.

Appeal pursuant to N.C.G.S. § 7A-27(a)(2) from an opinion and final judgment entered on 2 June 2023 by Judge Michael L. Robinson, Special Superior Court Judge for Complex Business Cases, in Superior Court, Wake County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(b). Heard in the Supreme Court on 17 September 2024.

*Jeff Jackson, Attorney General, by Tania X. Laporte-Reverón, Assistant Attorney General, Hunter E. Fritz, Assistant Attorney General, and Ronald D. Williams II, Special Deputy Attorney General, for State-appellee.*

*Culp Elliott & Carpenter, P.L.L.C., by Stanton P. Geller, for defendant-appellant.*

*Eversheds Sutherland (US) LLP, by Virginia "Jenny" Worthy, for Dish Wireless LLC, amicus curiae.*

RIGGS, Justice.

The North Carolina Sales and Use Tax Act (the Tax Act) imposes a tax on the sale of digital property including prepaid wireless calling service sold by retailers within the state. *See* N.C.G.S. § 105-164.4 (2023). Because prepaid wireless calling service can be offered in different forms, the Tax Act defines the characteristics of products that constitute "prepaid wireless calling service" under the Tax Act.

Wireless Center of NC, Inc. (Wireless Center), a North Carolina retailer for Boost Mobile (Boost), sells a product referred to as real-time replenishments (Replenishments). The North Carolina Department of Revenue (Department) audited Wireless Center over a period from January 2016 to December 2018 and concluded Replenishments were "prepaid wireless calling service." Therefore, it concluded that Wireless Center was responsible for collecting and remitting sales tax on its sale of Replenishments at the point of sale. Wireless Center argues that because the Replenishments act as a stored-value card, any tax should not be collected until the customer redeems the Replenishments for prepaid wireless calling service or products from Boost. Thus, this tax dispute centers on whether Wireless Center was responsible for collecting and remitting sales tax on Replenishments at the point of sale or whether tax should have been collected when the customer redeemed the Replenishments for Boost's prepaid wireless service or products.

Importantly, Wireless Center and Boost changed how the Replenishments could be redeemed during the audit period and that change affects our analysis of how the Replenishments should be taxed under the Tax Act. During the first half of the audit period (Period I), Replenishments could only be redeemed for prepaid wireless service on the Sprint network.[1] However, during the second half of the audit

---

[1] For clarification, Boost is a brand line owned by Sprint Solutions, Inc. Boost provides low-cost service on the Sprint network. In 2018 during the audit period, Sprint merged with T-Mobile US Inc. joining the wireless networks. In 2020, T-Mobile/Sprint sold its Boost line of business to DISH Network Corporation, effective 1 June 2020. For consistency, we refer to the wireless service provider

period (Period II), Replenishments could be redeemed for prepaid wireless service on the Sprint network or for the purchase of products from Boost.

This case was heard by the Office of Administrative Hearings (OAH) on Wireless Center's petition for a contested tax hearing and was subsequently heard by the North Carolina Business Court before being appealed to this Court. The administrative law judge presiding over the OAH hearing concluded that Wireless Center was liable for collecting and remitting sales tax on Period I Replenishments but was not liable for collecting and remitting sales tax on Period II Replenishments. In doing so, OAH found that the Period II Replenishments did not constitute prepaid wireless calling service at the point of sale from Wireless Center. The Business Court agreed with OAH on the Period I Replenishments but concluded that Wireless Center was liable for collecting and remitting sales tax on Period II Replenishments.

For the reasons below, we hold that during Period I of the tax audit, Wireless Center was responsible for collecting and remitting sales tax on its sale of Replenishments. During Period II of the tax audit, we hold that Wireless Center was not responsible for collecting and remitting sales tax on Replenishments at the point of sale; rather, in Period II, Boost was responsible for collecting and remitting sales tax on Replenishments when they were redeemed for prepaid wireless service on the Sprint network or products provided by Boost. Thus, we affirm the decision of the

---

as Boost through this opinion but clarify that any wireless services purchased with Replenishments were on the Sprint network during the audit period.

Business Court for the first portion of the audit period and reverse the decision of the Business Court as to the second portion of the audit period. For clarity, the holdings from OAH, the Business Court, and this Court are summarized as follows:

| | Period I | Period II |
|---|---|---|
| **OAH** | Character of Replenishment: prepaid wireless calling service<br><br>Timing of taxation: point of sale<br><br>Responsible for tax: Wireless Center | Character of Replenishment: stored-value card taxable at point of redemption<br><br>Timing of taxation: point of redemption<br><br>Responsible for tax: Boost |
| **Business Court** | Character of Replenishment: prepaid wireless calling service<br><br>Timing of taxation: point of sale<br><br>Responsible for tax: Wireless Center | Character of Replenishment: right to purchase prepaid wireless calling service<br><br>Timing of taxation: point of sale<br><br>Responsible for tax: Wireless Center |
| **Supreme Court of North Carolina** | Character of Replenishment: prepaid wireless calling service<br><br>Timing of taxation: point of sale<br><br>Responsible for tax: Wireless Center | Character of Replenishment: stored-value card taxable at point of redemption<br><br>Timing of taxation: point of redemption<br><br>Responsible for tax: Boost |

## I.    Factual Background

Wireless Center is an independent contractor and agent engaged in the retail sale of cellular phone equipment, prepaid wireless service, gift cards, and

Replenishments for Boost. Wireless Center operated six retail stores in Monroe, Greensboro, and Winston-Salem, North Carolina during the audit period. In 2016, Wireless Center entered into a "Branded Retailer Program Agreement" with Boost (the Boost Agreement) to exclusively sell Boost products, including Replenishments. The Boost Agreement defined Replenishments as "real time replenishment of [prepaid airtime] units for use on Sprint's network[;] . . . Airtime is *immediately* added directly to a Customer Account when the Airtime is purchased." (Emphasis added.) Initially, the Boost Agreement identified Wireless Center as a retailer for Boost and assigned responsibility for collecting and remitting sales tax on Replenishments to Wireless Center.

In 2017, Boost and Wireless Center modified the Boost Agreement. The modification changed the Replenishments into a stored-value card and made Boost responsible for collecting and remitting sales tax on Replenishments at the point of redemption. Boost sent a notice (the Boost Notice) to its retailers, including Wireless Center, that Replenishments would transition from functioning as prepaid wireless calling cards to stored-value cards, which could be used to purchase Boost's products and services, including wireless telecommunications service, internet access service, ringtones and digital games among other products and services. The Boost Notice stated that Boost assumed responsibility for "collecting all taxes that apply to the sale and use of Stored-Value Cards at the time Stored-Value Cards are redeemed for Boost's products and services."

The Department performed a tax audit on Wireless Center's retail sales for the period of 1 January 2016 to 31 December 2018. The Department determined that Wireless Center failed to collect sales tax on Replenishment sales throughout the entire audit period. Using Wireless Center's gross receipts for the audit period, the Department assessed Wireless Center a tax liability of $516,700.37, including penalties and interest. The Department issued a Notice of Final Determination to Wireless Center on 7 July 2021, notifying Wireless Center of this tax liability.

## II. Procedural Background

Wireless Center filed a petition for a contested tax hearing with OAH. Relevant to this appeal, Wireless Center made two objections to the tax assessment. First, Wireless Center argued that it was not responsible for remitting sales tax on Replenishments because Wireless Center was not a "retailer" of Replenishments. Second, Wireless Center argued that the Department's "decision to resort to using gross receipts was arbitrary and capricious and artificially inflated [Wireless Center's] sales tax liability for the [y]ears at issue" because it included sales of equipment which Wireless Center had already paid taxes on.

Because Boost and Wireless Center had changed the contractual agreement for responsibility for remitting sales tax for Replenishments in 2017, OAH considered Wireless Center's tax liability for two separate time periods. Period I covered the first half of the audit period from 1 January 2016 when, per the Boost Agreement, Replenishments were "real time replenishment of [prepaid airtime] units" that were

added immediately to a customer's account when purchased, until 7 September 2017 when the Replenishments transitioned into stored-value cards and Boost assumed responsibility for tax on Replenishments redeemed for prepaid wireless service. Period II covered the balance of the audit from 8 September 2017 until 31 December 2018. Although Wireless Center collected and remitted sales tax on all other products it sold during the audit period, Wireless Center conceded that for the entire audit period, it did not collect or remit sales tax on its sale of Replenishments.

During the OAH hearing, Wireless Center argued that Replenishments operated like traditional prepaid calling cards, sold to consumers for specific dollar amounts or minutes to be used solely for phone calls or data access. The Replenishments were limited to purchasing wireless service and could not be used for any other purpose. During Period II, after the Boost Agreement was modified, Boost restructured Replenishments into stored-value cards and Boost assumed responsibility for collecting and remitting tax when Replenishments were redeemed for services and products provided by Boost. Under this new model, consumers could use Replenishments to purchase telecommunications services, products, and other services, including internet access, all from Boost. Boost was then responsible for collecting and remitting tax on Replenishments redeemed for wireless service on the Sprint Network or for other Boost services or products which may or may not have been subject to sales tax.

As a threshold matter, Wireless Center contended during the hearing that,

while Wireless Center acted as a retailer for items and services sold within its stores, it was not a retailer of Replenishments as that term is defined under the Tax Act. Wireless Center argued that it merely facilitated transactions that occurred directly between Boost and its customers and that Boost was the actual retailer. As such, Wireless Center claimed it was not subject to the obligation to collect sales tax because, according to Wireless Center, it did not meet the definition of "retailer" with regard to prepaid wireless calling services because it did not actually make the sale of such services. *See* N.C.G.S. § 105-164.3(35) (2017) (defining retailer as "[a] person engaged in business of making sales at retail, offering to make sales at retail, or soliciting sales at retail of . . . services sourced to this State"). For reasons below, we hold that Wireless Center was a retailer of Replenishments as defined under the Tax Act.

In support of its argument that Boost—rather than Wireless Center—should have paid the taxes for Replenishments redeemed for prepaid calling services during Period II specifically, Wireless Center presented evidence at the hearing from Sprint, the owner of the Boost brand and the legal entity responsible for remitting taxes associated with Boost. The evidence included an unsigned May 2021 letter from Sprint addressed to retailers which explained the roles and responsibilities between Boost and its partners for collecting and remitting North Carolina taxes (the Sprint Letter). The Sprint Letter stated that, after 8 September 2017, Replenishments were to be treated as store credits under a tax-inclusive model, which required Boost,

rather than its retailers, to collect and remit sales tax when Replenishments were redeemed for wireless services on the Sprint network. The Sprint Letter further stated that Replenishments should be treated at the point of sale as stored-value cards from a tax perspective, with sales tax applied upon redemption for Boost services and products, rather than at the point of initial sale from retailers. However, Boost does not track how much tax it paid to North Carolina for Replenishments purchased at Wireless Center stores, as the Sprint Letter clarified that "Boost was agnostic with respect to the origination point of credit customers brought to the Boost ecosystem"— i.e., Boost does not track which of its retailers originally sold the Replenishment now being redeemed for use by a customer for services or products provided by Boost.

During the hearing, Wireless Center also presented an October 2019 affidavit from Anthony Whalen, Sprint's Senior Tax Counsel, who was responsible for the Boost line of business (the Whalen Affidavit). The Whalen Affidavit similarly stated that Replenishments functioned like stored-value cards or gift cards, where no tax was due or collected at the time of sale. Instead, Boost was responsible for collecting and remitting sales tax when the customer redeemed the Replenishments to purchase Boost's services or products. The Whalen Affidavit emphasized that tax was not due at the time of the initial sale by Boost dealers but rather was due when the customer redeemed the Replenishments for prepaid wireless calling service or for other products provided by Boost.

The administrative law judge (ALJ) presiding over the hearing allowed the Department to present evidence that the tax determination was correct. The ALJ specifically asked whether the Department had confirmed if Boost paid the sales tax since September 2017, the start of Period II. When the ALJ asked Andrew Furuseth, the Director of the Department's Sales and Use Tax Division, whether Boost had paid the tax on Replenishments that were redeemed during Period II, Mr. Furuseth indicated that the Department could not disclose information about a taxpayer that was not a party to the tax dispute.

In a Final Decision order, the ALJ reversed the Department's sales tax assessment for Period II. The ALJ further ordered the Department to "re-calculate and re-assess the tax owed" by Wireless Center for Period I after deducting the "gross receipts for equipment sales for which [Wireless Center] has already paid taxes," as the ALJ found that "it is uncontested that [Wireless Center] paid all taxes due for equipment sold by it" and found that "[the Department] had an obligation to deduct the gross sales receipts for equipment sold *prior to* assessing tax against [Wireless Center] for services sold."

Specifically, the ALJ found that Wireless Center was responsible for collecting and remitting sales tax only for Period I, because those Replenishments were treated solely as prepaid wireless calling services, with the ALJ noting in the Final Decision that "Mr. Furuseth testified there is no difference between [Period I Replenishments] and prepaid wireless service—a position that appears to hold true regarding the

services sold by [Wireless Center] prior to [Period II]". (Emphasis omitted.) As to Period II taxes, the ALJ concluded that Wireless Center's evidence—documents from Sprint, including the Whalen Affidavit—overcame the presumption that the Department's assessment was correct. The ALJ further concluded that the Department failed to demonstrate that the taxes had not been paid, acknowledging that the Department "*failed to prove by a preponderance of the evidence that the tax is still owing*," as the Department "refus[ed] to answer the Tribunal's questions as to whether Boost had paid the owed taxes from September 8, 2017 forward and, if so, how much had been paid." The ALJ remanded the case for recalculation of Wireless Center's liability, excluding Period II Replenishments. The decision also required the Department to "[d]educt from Petitioner's gross receipts the gross receipts for equipment sales for which [Wireless Center] has already paid taxes."

Both parties sought review at the Business Court. The Business Court reversed OAH's Final Decision, affirming the Department's tax assessment in full. The Business Court concluded that Replenishments in Periods I and II met the definition of "prepaid wireless calling services" under N.C.G.S. § 105-164.3(27a). Thus, Wireless Center was responsible for remitting sales tax on the sales of Replenishments during both periods. Further, the Business Court concluded that in the absence of documentation showing that Boost paid taxes for Replenishments sold by Wireless Center during Period II, Wireless Center had not rebutted the presumption of correctness afforded to the Department. Wireless Center now

appeals.

## III. Analysis

In this appeal, we are asked to perform a fact-intensive inquiry by interpreting the Tax Act and its application to the sale of Replenishments by Wireless Center. Specifically, the parties dispute whether Wireless Center is a retailer of Replenishments as defined by the Tax Act and, if so, whether the Replenishments are taxable prepaid wireless service under the North Carolina tax scheme. Finally, we are also asked to review the presumption of correctness afforded to the Department's tax assessment.

For the reasons set forth below, on the first question of whether Wireless Center was a "retailer," we hold that under the Tax Act, Wireless Center was a retailer of Replenishments sold by Wireless Center. Examining the audit period during Period I, the Replenishments were prepaid wireless calling services taxable at the point of sale. Therefore, Wireless Center was responsible for collecting and remitting taxes on its sales of Replenishments. However, during Period II, the Replenishments did not meet the statutory definition of "prepaid wireless calling service." In Period II, Replenishments were taxable when redeemed based on how the Boost Agreement changed Replenishments into a stored-value card that a customer could use to purchase various Boost services and products. [2] Thus, in Period

---

[2] The Whalen Affidavit indicates that Boost's services and products include "contractless, low cost, telecommunications and related products and services. These services include wireless voice services, internet access service, text messaging, games, applications,

II, Wireless Center was not responsible for sales tax on Replenishments at the point of sale; rather, Boost was responsible for collecting and remitting any sales tax on Replenishments when customers redeemed them for services and products provided by Boost; that tax would vary based on what the customer ultimately redeemed the Period II Replenishment for. For these reasons, we affirm the decision of the Business Court for the first portion of the audit period and reverse the decision of the Business Court as to the second portion of the audit period regarding Wireless Center's tax liability for Replenishment sales.

Regarding issues related to the tax assessment, we hold that the Business Court did not err in concluding that the Department's assessment properly credited Wireless Center for sales tax that Wireless Center had previously remitted. However, the Department must adjust the tax assessment to reflect that Wireless Center was not liable for collecting and remitting sales tax on Replenishments it sold in Period II. Therefore, we remand this case for recalculation of Wireless Center's tax liability to reflect that Wireless was not responsible for collecting and remitting sales tax on Period II Replenishments it sold.

## A. Standard of Review

"An appellate court reviewing a superior court order regarding an agency decision examines the trial court's order for error of law." *Holly Ridge Assocs. LLC v.*

---

ringtones, equipment insurance plans, and a variety of other electronically delivered services."

*N.C. Dep't of Env't and Nat. Res.*, 361 N.C. 531, 535 (2007) (cleaned up).  In its review for errors of law, the appellate court must both (1) "determine whether the trial court exercised the appropriate scope of review" and, (2) "if appropriate, decide whether the court did so properly." *Midrex Techs., Inc. v. N.C. Dep't of Revenue*, 369 N.C. 250, 256 (2016) (cleaned up).

When the Superior Court reviews an agency's decision, the proper standard of review "depends upon the particular issues presented on appeal." *Mann Media, Inc. v. Randolph Cnty. Plan. Bd.*, 356 N.C. 1, 13 (2002) (quoting *ACT-UP Triangle v. Comm'n for Health Servs.*, 345 N.C. 699, 706 (1997)).  If the petitioner contends that the agency's decision was based upon an error of law, the trial court reviews de novo. *Id.*  When a petitioner challenges "whether the agency's decision was supported by evidence or . . . whether the decision was arbitrary or capricious, then the reviewing court must apply the 'whole record' test." *Id.* (quoting *ACT-UP Triangle*, 345 N.C. at 706); *accord Thompson v. Wake Cnty. Bd. of Educ.*, 292 N.C. 406 (1977).  Under the whole record test, "the reviewing court merely determines 'whether an administrative decision has a rational basis in the evidence.'" *In re  Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647 (2003) (quoting *In re Appeal of McElwee*, 304 N.C. 68, 87 (1981)).

This Court begins by analyzing whether the Business Court exercised the appropriate standards of review when considering OAH's Final Decision, and, if so, whether the Business Court utilized those standards properly.

Here, the Business Court considered whether Wireless Center was a "retailer" and whether the Replenishments were "prepaid wireless calling service" during the audit period under the definitions established by the Tax Act. As such, the Business Court was to apply de novo review to the appealed questions of law decided on by OAH, and this Court is satisfied that the record reflects that the Business Court utilized the de novo review standard in considering those issues. Further, the Business Court reviewed OAH's findings regarding the Department's tax assessment. The Business Court was required to apply the whole record test to the argument that OAH's findings regarding the assessment were not supported by the evidence, and this Court is satisfied that the record reflects that the Business Court used the whole record test to review those particular findings. Accordingly, as the Business Court utilized the appropriate standards of review, this Court now assesses whether the Business Court exercised those standards properly as a matter of law.

## B. Wireless Center is a Retailer

The first issue is whether Wireless Center is a retailer of Replenishments based upon the statutory definition of a "retailer" in the Tax Act. Wireless Center contends that it is not a "retailer" of the Replenishments because it does not own the Replenishments and merely acts as an intermediary in the transaction between Boost and customers. However, Wireless Center's assertion that it is not a retailer runs contrary to the plain language of the Tax Act and conflicts with this Court's precedent. Additionally, the contention directly contradicts the original agreement

between Wireless Center and Boost.

At the time of the tax audit in 2018, the Tax Act defined a "retailer" as "[a] person engaged in business of making sales at retail, offering to make sales at retail, or soliciting sales at retail of tangible personal property, digital property for storage, use or consumption in this State, or services sourced to this State." N.C.G.S. § 105-164.3(35)(a) (2017).[3] This statute further defined a "sale" as "[t]he transfer for consideration of title, license to use or consume, or possession of tangible personal property or digital property or the performance for consideration of a service." *Id.* § 105-164.3(36). According to the Tax Act, retailers are required to pay privilege tax on the net taxable or gross receipts of sales including the sale of certain digital property. *Id.* § 105-164.4(a)(1). This privilege tax applied "to the sales price of each item or article of tangible property that is sold at retail and is not subject to tax under another subdivision in this section." *Id.*[4]

Further, this Court has long held that a retailer does not need to hold title to property that it sells. As early as 1944, this Court recognized that a business selling

---

[3] N.C.G.S. § 105-164.3 was modified several times during the time frame of the audit. In January 2017, the definition of retailer in subsection 35 was modified however the quoted language remained unchanged. An Act to Make Various Changes to the Revenue Laws, S.L. 2017-204, § 2.1, 2017 N.C. Sess. Laws 1433, 1444–47.

[4] Effective 16 July 2019, the General Assembly added subsection (b) to this statute to specifically require tax on the sale of certain digital property "regardless of whether the purchaser of the property has a right to use it permanently or to use it without making continued payments." An Act to Make Various Clarifying and Administrative Changes to the Revenue Laws, S.L. 2019-169, § 3.2, 2019 N.C. Sess. Laws 682, 688. While this version of the statute was not in place during the audit period, the fact that it was a clarifying change lends credence to our interpretation of the statute.

products on behalf of a third party, while receiving a commission, is a retailer for tax purposes. For example, in *Johnston v. Gill*, the Court held that a plaintiff who received a commission for taking the order and necessary measurements for custom clothing before forwarding the order to a tailoring company is a retailer. 224 N.C. 638, 641–42 (1944). Similarly, in *Handley Motor Co. v. Wood*, the Court determined that a party exchanging property on behalf of the titleholder for consideration still conducts a valid sale. 238 N.C. 468, 476–77 (1953).

Based upon statutory language and this precedent, Wireless Center was a retailer of Replenishments as defined in the Tax Act. The parties do not dispute—at least during Period I—that the Replenishments constitute digital property.[5] Wireless Center conceded that Period I Replenishments operated as traditional prepaid calling cards, sold to consumers for specific dollar amounts or minutes to be used solely for phone calls or data access. Wireless Center routinely transferred title of Replenishments, which are digital property, to consumers in exchange for consideration and received a commission from Boost for these sales. For these reasons, Wireless Center is a retailer of Replenishments as Wireless Center's conduct aligned with the statutory definition of "retailer" and this Court's interpretation of a "retailer" under the Tax Act.

## C. Replenishments Were Prepaid Wireless Calling Services During Period I and Gift Cards During Period II.

---

[5] The Tax Act did not define "digital property" during the audit period. N.C.G.S. § 105-164.3 (2017).

Having concluded that Wireless Center was a Replenishments retailer, we now turn to whether Replenishments were a form of a prepaid calling service that was taxable at the point of sale. Because Boost expanded the options of what could be purchased by a customer using Replenishments during Period II of the audit period, we must consider whether the Replenishments represent prepaid calling service both before and after Boost transitioned Replenishments to function as stored-value cards on 8 September 2017.

Prepaid wireless calling service is defined as a right that: (1) "[a]uthorizes the purchase of mobile telecommunications service, either exclusively or in conjunction with other services"; (2) "[m]ust be paid for in advance"; and (3) "[i]s sold in predetermined units or dollars whose number or dollar value declines with use and is known on a continuous basis." N.C.G.S. § 105-164.3(27a) (2017). During Period I, the Replenishments met the statutory definition of prepaid calling service because they could only be used to purchase wireless telecommunications services. Customers purchased the Replenishments and then immediately loaded the airtime into their wireless accounts in preset units of time that diminished with each use. Replenishments therefore met the definition of prepaid wireless calling service as defined in N.C.G.S. § 105-164.3(27a) (2017). Accordingly, the Period I Replenishments were taxable at the point of sale according to N.C.G.S § 105-164.4(a)(4d) (2017) ("Prepaid telephone calling service is taxable at the point of sale instead of at the point of use."), and, under section 105-164.4, Wireless Center had an

obligation to remit tax for the sale of Replenishments during Period I.

However, the modifications to the Boost Agreement in 2017 took Replenishments out of the realm of prepaid wireless calling service. North Carolina General Statute subsection 105-164.3(27a) defined prepaid wireless calling services as "[a] right that . . . [a]uthorizes the purchase of mobile telecommunications service *either exclusively* or *in conjunction with* other services" N.C.G.S. § 105-164.3(27a) (2017) (emphasis added). The statutory language defining prepaid wireless service is clear and unambiguous. *See Wiggs v. Edgecombe County*, 361 N.C. 318, 322 (2007) ("If the statute is clear and unambiguous, [the Court] appl[ies] the plain meaning of the words, with no need to resort to judicial construction."). The plain language of N.C.G.S. § 105-164.3(27a) required prepaid wireless calling services to *either* authorize the purchase of telecommunications services alone or *in conjunction with* other products. Because a customer could use Replenishments in Period II to purchase Boost products, *without purchasing telecommunication services*, the Period II Replenishments no longer met the statutory definition of prepaid wireless service at the point of sale from Wireless Center.

Looking specifically at the parties' arguments and the record as to whether the Period II Replenishments were prepaid wireless service and thus taxable at the point of sale, Wireless Center provided evidence in the proceedings that during Period II, customers could use Replenishments without purchasing wireless telecommunication service. According to the Boost Notice, Replenishments were treated as "stored-value

cards." Additionally, Wireless Center introduced the Whalen Affidavit that stated that "Boost [Period II Replenishments], whether cards or electronic, represent an intangible right, can be used to purchase other products and services, and are not limited to purchasing telecommunication services." The Whalen Affidavit is undisputed evidence that Period II Replenishments were essentially gift cards and that Boost was responsible for collecting and remitting appropriate sales tax when the customer redeemed the Replenishments.

The Department contended to the Business Court that the Whalen Affidavit's and the Boost Notice's respective characterizations of the Period II Replenishments as gift cards were uncorroborated hearsay not subject to any exception, arguing that OAH erred as a matter of law in relying upon that evidence. We do not find merit in this argument.

In its review of OAH's Final Decision, the Business Court did not reach a conclusion as to whether the Whalen Affidavit and the Boost Notice were hearsay. Rather, the Business Court concluded that Boost's characterization of the Replenishment as a gift card during Period II was not credible or persuasive, stating that "neither the Whalen Affidavit nor the Sprint Letter provide how, if at all, the nature of [Replenishments] changed under the law during Period II." But when the Business Court sits as an appellate court reviewing an agency decision, the Business Court does not assess the credibility of the evidence. *See Thompson*, 292 N.C. at 410 (explaining that the whole record test does not allow the reviewing court to replace

the lower tribunal's judgment between two conflicting views even if the court "could justifiably have reached a different result"). Instead, the reviewing court must simply determine "whether an administrative decision has a rational basis in the evidence," *In re Greens of Pine Glen Ltd.*, 356 N.C. at 647 (cleaned up), after "taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Thompson*, 292 N.C. at 410 (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951)).

This Court finds that the Boost Notice and the Whalen Affidavit, were, in fact, relevant evidence to the question of whether the Replenishments met the statutory definition of prepaid wireless calling service. Thus, the Business Court erred in concluding that the Boost Notice's and Whalen Affidavit's respective characterizations of the Period II Replenishment as a gift card were not credible or persuasive evidence, and it was appropriate for the ALJ to consider that evidence. As such, this Court holds that the Business Court erred in how it considered the Boost Notice and the Whalen Affidavit when reviewing the issue of whether Replenishments constituted prepaid wireless calling service during Period II.

In administrative proceedings, an ALJ may consider traditionally inadmissible evidence when more reliable information is not available. *See* N.C.G.S. § 150B-29 (2023) (applying the rules of evidence to administrative hearings unless evidence is not reasonably available to show relevant facts). Additionally, this Court has affirmed the use of potentially inadmissible evidence in administrative hearings

when it is the most reliable information reasonably available. *See, e.g.*, *In re McLean Trucking Co.*, 281 N.C. 375, 387 (1972) (noting that the use of the Blue Book published by National Market Reports, Inc. in a State Board of Assessment proceeding was allowed even though it was hearsay); *In Re N.C. Fire Ins. Rating Bureau*, 275 N.C. 15, 35 (1969) (allowing the use of hearsay projections of future replacement cost to determine allowable insurance premiums); *see also, e.g.*, *N.C. Dep't of Pub. Safety v. Ledford*, 247 N.C. App. 266, 290 (2016) (noting that even if the statements at issue were hearsay, "our General Assembly, through the Administrative Code, has entrusted ALJs with broad discretion to admit probative evidence during administrative hearings"). Based upon the Whalen Affidavit and the Sprint Letter, in addition to the Boost Notice and testimony provided by Mr. Furuseth, there is evidence in the record from which an ALJ could rationally conclude that Period II Replenishments did not meet the statutory definition of prepaid wireless calling service at the point of sale from Wireless Center.

Indeed, the conclusion that Phase II Replenishments are not prepaid calling service finds support in the statutory definition, and the Business Court did not perform a statutory analysis. Interpreting Phase II Replenishments as the Department suggests—that Replenishments are prepaid wireless calling service because Replenishments can be used to purchase wireless calling service—would render superfluous or meaningless the statute's specific language requiring prepaid wireless calling services to authorize the purchase of mobile telecommunications

services "either exclusively or in conjunction with other services." N.C.G.S. § 105-164.4(27a) (2017). In essence, the General Assembly shifted the burden of which party was responsible for collecting sales tax depending on what was purchased. For example, a $50 American Express gift card can be used to purchase prepaid wireless calling service, but the purchaser of that $50 American Express gift card is not taxed for the purchase of prepaid wireless calling service until the customer uses the gift card to purchase it. Using this hypothetical, the plain language of the statute indicates that the legislature did not (and could not) expect American Express to know if the purchasers of its $50 gift cards intended to use that purchased gift card to buy cell phone minutes or data, in part or in whole. And American Express certainly could not charge the customers sales tax on whatever speculative portion of that $50 gift card might ultimately be spent on cell phone minutes or data. If Replenishments qualify as prepaid wireless calling service even when not used to purchase telecommunications services, the clause "either exclusively or in conjunction with other services" would lose all meaning. *Porsh Builders, Inc. v. City of Winston-Salem*, 302 N.C. 550, 556 (1981) (recognizing that the legislature does not intend any provision to be mere surplusage).

Because the ALJ determined in his review of the record that Period II Replenishments permit the option for customers to solely purchase standalone products without any telecommunications services, the ALJ concluded that Period II Replenishments are not prepaid wireless service at the point of sale. We agree with

the ALJ's conclusion and conclude that Period II Replenishments were only taxable upon redemption for prepaid wireless service or products from Boost.

This Court is further convinced that Period II Replenishments were not taxable at the point of sale when considering the tax treatment of gift cards in the North Carolina Administrative Code. While the Tax Act does not define a gift card or gift certificate, the North Carolina Administrative Code clarifies that "[c]harges for gift certificates or gift cards are not subject to sales and use tax, pursuant to [N.C.]G.S. § 105-164.4, at the time of initial sale for the gift certificate or gift card." 17 N.C. Admin. Code 7B.3804 (2024). Instead, the transaction is subject to "sales and use taxes applicable to the item as if it were purchased without a gift certificate or gift card." *Id.* Applying this to the understanding that Period II Replenishments are gift cards, Wireless Center was not responsible for collecting and remitting sales tax on the Period II Replenishments at the point of sale; rather, consistent with the tax treatment of gift cards as stated above, any tax should be determined at the point of redemption, meaning that tax liability in this case turned on the service or product that the customer ultimately purchased using the Replenishments.

In sum, Period I Replenishments—which could *only* be redeemed for prepaid wireless service—fall within the statutory definition of prepaid wireless calling services at the point of sale; thus, Wireless Center was responsible for collecting and remitting sales tax during that period. However, Period II Replenishments—which could be purchased from Wireless Center and redeemed *either* for Boost prepaid

wireless service *and/or* the purchase of products provided by Boost—do not meet the statutory definition of prepaid wireless calling services at the point of sale; and therefore, Wireless Center was not responsible for collecting and remitting sales tax when it sold Period II Replenishments. Thus, we affirm the decision of the Business Court for the first portion of the audit period and reverse the decision of the Business Court as to the second portion of the audit period.

**D. Wireless Center Did Not Rebut the Presumption of Correctness Afforded to the Department's Tax Assessment for Period I.**

Next, we address Wireless Center's argument that it successfully rebutted the presumption of correctness afforded to the Department's assessment and that the Business Court erred in concluding otherwise. The Department assessed sales tax for all Replenishments sold by Wireless Center throughout the entire audit period. Because we conclude that Period II Replenishments were not taxable at the point of sale, that portion of the Department's tax assessment is rendered extraneous and the presumption of correctness as to that portion—i.e., taxes associated with Period II Replenishments—need not be addressed in depth here. Thus, this Court's inquiry will focus only on the first half of the audit period—1 January 2016 through 7 September 2017. For the reasons set forth below, we hold that the Business Court did not err in determining that the Department had properly credited Wireless Center for taxes remitted. However, the Department must adjust the tax assessment to reflect the nontaxable nature of the Period II Replenishments when initially purchased from Wireless Center.

Generally, tax assessments are presumed to be correct. N.C.G.S. § 105-241.9(a) (2023) ("A proposed assessment of the Secretary is presumed to be correct."); *see also In re Appeal of McElwee*, 304 N.C. at 75 ("[T]he correctness of tax assessments, the good faith of tax assessors and the validity of their actions are presumed."). However, the Secretary may only "propose an assessment against a taxpayer for *tax due from the taxpayer*." N.C.G.S. § 105-241.9(a). It follows then that when a taxpayer demonstrates that tax is not due from that taxpayer because the product is not subject to sales tax, the taxpayer has rebutted the presumption of correctness afforded to the Department. *See Olin Mathieson Chemical Corp. v. Johnson*, 257 N.C. 666, 667 (1962) ("A taxpayer who challenges a sales tax coverage by virtue of an exemption or exclusion has the burden of showing that he comes within the exemption upon which he relies.").

Wireless Center argues that the tax assessment for the first half of the audit period overstates the taxes that Wireless Center still owes because the assessment did not credit Wireless Center for the taxes that it already remitted for its equipment sales. The ALJ agreed with Wireless Center on this point, but the Business Court reversed, concluding the Department had credited Wireless Center for the tax it already remitted. For reasons below, we agree with the Business Court that the Department did properly credit Wireless Center for taxes remitted.

Wireless Center argues, and the ALJ concluded, that the Department's tax assessment was based upon Wireless Center's total sales and did not credit Wireless

Center for the taxes it paid on sales of products from 2016 through 2018. On appeal, the Business Court—using the whole record test—concluded that the Record showed the Department reduced Wireless Center's tax assessment based upon its reported taxable sales. The final tax assessment, Notice of Final Determination dated 7 July 2021, relied upon a tax form which was updated in 2020 to reflect Wireless Center's taxable sales in 2016 through 2018. The Department made changes to the proposed adjustments "based on the additional documentation [Wireless Center] previously provided."

Because the Department updated the assessment's reported taxable sales based upon Wireless Center's information, the Business Court did not err in concluding that the assessment was based upon the "best information available"—including taxes that Wireless Center itself previously reported. *See* N.C.G.S. § 105-241.9(a) (2023) (requiring that the Department base the assessment on the "best information available").

Finally, to the extent that the Department was required to rebut the ALJ's finding that Wireless Center overcame the presumption of correctness of the assessment, the Department has done so through Wireless Center's own documentation that Boost only paid taxes on Replenishments starting in Period II. The ALJ acknowledged that "in [Wireless Center's] own exhibits, Sprint/T-Mobile/Boost are clear that until [Period II], the onus of collecting and remitting taxes—even on [Replenishments] and prepaid calling services—was on their dealer

partners, which included [Wireless Center]." Thus, any argument concerning whether the Department had already collected taxes from Boost (i.e., a double taxation issue) is limited to the Department's tax assessment of Period II. Our holding that Wireless Center was not liable for taxes associated with Period II Replenishments means we do not need to further address the Business Court's discussion of the presumption of correctness; rather, we simply conclude that the Department's tax assessment of Period II will need to be recalculated to reflect that Wireless Center was not liable for the collection and remittance of sales tax on Period II Replenishments.[6]

In conclusion, the Business Court did not err in concluding that the final tax assessment properly credited Wireless Center for sales tax that it had previously remitted and therefore Wireless Center did not rebut the presumption of correctness afforded to the Department's tax assessment on that argument.

### E. The Question of Whether the Internet Tax Freedom Act Prohibits Taxing of Replenishments is Not Properly Before this Court.

Lastly, for the first time in this appeal, Wireless Center argues that taxing Replenishments at the point of sale violates the federal Internet Tax Freedom Act.

---

[6] Notwithstanding our conclusion, we note that, in an ideal world, the administrative law judge would have had better tax record keeping from all the parties. Instead, with the somewhat limited record before it, the ALJ presiding over the administrative hearing had to rely primarily on evidence such as the Whalen Affidavit and the Boost Notice, with which the Business Court took issue. While Wireless Center did present evidence that Boost was responsible for collecting and remitting sales tax on Period II Replenishments, better recordkeeping by Wireless Center would have streamlined this litigation.

In its brief, the Department argues that Wireless Center is bringing this issue up for the first time in this appeal, i.e., that the Department may not tax Replenishments because the Replenishments may be used to purchase internet service. In reply, Wireless Center argues this is simply a legal argument against taxing Replenishments and not a separate issue. Regardless of how it is framed, Wireless Center did not raise the question of whether taxing Replenishments at the point of sale violates federal law either with the ALJ or the Business Court.

An issue that is not presented to the trial court cannot be raised for the first time on appeal. *See* N.C. R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context."); *see also M.E. v. T.J.*, 380 N.C. 539, 564 (2022) (acknowledging a "well-established prohibition of raising new issues on appeal"). Therefore, this question is not properly before the Court, and we will not address it.

## IV.  Conclusion

In sum, in our fact-intensive review of this matter, Wireless Center is a retailer of Replenishments as defined in the Tax Act, and Replenishments sold during Period I met the statutory definition of prepaid wireless service. Thus, Wireless Center was responsible for remittance of sales tax on Replenishments sold by Wireless Center during Period I of the audit period. For that reason, we affirm the decision of the

Business Court that Wireless Center owed taxes for Replenishments it sold in Period I.

In Period II, the Replenishments did not meet the statutory definition of prepaid wireless service at the point of sale from Wireless Center. Therefore, Wireless Center was not liable for taxes on Replenishments sold during Period II, and we reverse the decision of the Business Court for Period II.

Finally, we hold that the Business Court did not err in concluding that the Department's tax assessment properly credited Wireless Center for sales tax that it had previously remitted, thus Wireless Center did not meet its burden in overcoming the presumption of correctness of the Department's tax assessment on that point. The Department's assessment did properly credit Wireless Center for sales tax that it previously remitted. However, given that the assessment included that Wireless Center was liable for collecting and remitting sales tax on Period II Replenishments which this Court holds was an error, this matter is remanded to Superior Court, Wake County for further remand to the Office of Administrative Hearings for recalculation of Wireless Center's tax liability consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Justice BARRINGER concurring.

I concur with the majority opinion. However, I write separately to emphasize my concern that Wireless Center reached this favorable result despite what appears to be a disregard for good recordkeeping and accounting practices. Separately, I am further concerned by the Department's decision to pursue both Wireless Center and Boost for the same tax liability.

Wireless Center argued that even if it bore responsibility for collecting taxes on Replenishments during Period II, it should not be forced to pay. This argument was premised on a bald, unsupported assertion that the taxes had already been remitted by Boost. If appropriate accounting records had been kept, Wireless Center would have had documentation affirmatively *proving* that Boost had, in fact, remitted the taxes. However, it is troublesome that Wireless Center did not provide any such records.[1] I am concerned that this strategy is indicative of insufficient accounting and recordkeeping.

A business's tax records should be verifiable—that is, sufficient to enable "different knowledgeable and independent observers [to] reach consensus" that the taxes were duly reported and remitted.[2] As this case's winding appeal shows,

---

[1] Rather, Wireless Center merely relied on the averments of Mr. Whalen, Sprint's Senior Tax Counsel, and statements made in a notice sent by Boost to its retailers.

[2] Fin. Acct. Stands. Bd., Conceptual Framework for Financial Reporting 44 (Sep. 2024), https://storage.fasb.org/Conceptual%20Framework%20for%20Financial%20Reporting%20%28September%202024%29.pdf.

Wireless Center's records were not sufficient to enable independent observers to reach the same conclusion. In other words, Wireless Center's inadequate recordkeeping rendered its tax reporting and remittance unverifiable.

Audits verify compliance—the accuracy of tax reporting and remittance. Wireless Center's apparent lack of records undermined this process. This is unacceptable. It was incumbent upon Wireless Center to rebut the presumption that the Department's assessment was correct. N.C.G.S. § 105-241.9(a) (2023). Nowhere in the record has Wireless Center done so. Rather, to the contrary, OAH found that Wireless Center did not even inquire of Boost to confirm if it had paid the taxes. It is troublesome that Wireless Center appears to have completely abdicated its tax collection and recordkeeping responsibilities.

Nevertheless, today Wireless Center has emerged partially victorious—but no thanks to its documentation, or lack thereof. Today's decision, grounded in strict statutory interpretation, should not be read as a vindication of Wireless Center's practices. Had this Court instead ruled that the burden of collecting Period II taxes was indeed borne by Wireless Center, perhaps these apparently deficient

---

"[T]he Financial Accounting Standards Board (FASB) . . . establishes financial accounting and reporting standards for . . . Generally Accepted Accounting Principles (GAAP)," which are "intended to promote financial reporting that provides useful information to . . . [those] who use financial reports." Fin. Acct. Stands. Bd., *About the FASB* [hereinafter Fin. Acct. Stands. Bd., *About the FASB*], https://www.fasb.org/about-us/about-the-fasb (last visited Dec. 4, 2025). "FASB is recognized by the U.S. Securities and Exchange Commission as the designated accounting standard setter for public companies. FASB standards are recognized as authoritative by many other organizations, including state Boards of Accountancy and the American Institute of CPAs (AICPA)." *Id.*

documentation and accounting practices could have led to serious legal and tax consequences.

Wireless Center's seemingly substandard documentation practices "should not serve as a model for future litigants involved in [similar] disputes." *Town of Apex v. Rubin*, 388 N.C. 236, 256 (2025) (Newby, C.J., concurring in part and concurring in result only in part). Rather, *all* taxpayers facing audits should, with appropriate documentation, be prepared to rebut the presumption that the Department's assessment is correct.

This is true too of Boost: Should the Department pursue it for tax liability, Boost should be ready with appropriate records, as required by FASB.

I do not take lightly an accusation that the Department may be attempting to collect the tax twice, potentially assessing and then levying the full amount owed against both Wireless Center and Boost. Such double-dipping would of course be impermissible. Although I recognize that "[s]tate regulators are not angels," *Cedarbrook Residential Ctr., Inc. v. N.C. Dep't of Health & Hum. Servs.*, 281 N.C. App. 9, 20 (2021) (Dietz, J., concurring), *rev'd*, 383 N.C. 31 (2022), it is my hope that the Department, in an attempt to collect the tax just *once*, is employing a process akin to alternative liability to overcome the dearth of documentation. I emphasize that the Department would not have had to resort to such measures had Wireless Center maintained and presented proper documentation.

Chief Justice NEWBY joins in this concurring opinion.